IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| THE MINEO CORPORATION,<br>THE MINEO CORPORATION EMPLOYEE<br>WELFARE BENEFIT PLAN,<br>FRANCESCO MINEO and<br>BEVERLY MINEO,<br><br>                    Plaintiffs,<br><br>          v.<br><br>PHILIP D. ROWE,<br>JUDI CARSRUD,<br>URAH T. WILLIAMSON, JR.<br>ALTON G. MILLS,<br>NICHE MARKETING, INC.,<br>NICHE PLAN SPONSORS, INC.,<br><br>                    Defendants. | Civil Action<br><br>No. |

## COMPLAINT AND JURY DEMAND

Plaintiffs, The Mineo Corporation ("Mineo"), The Mineo Corporation Employee Welfare

Benefit Plan (the "Mineo Plan"), Francesco Mineo and Beverly Mineo, by way of Complaint

against Defendants, hereby allege as follows:

## NATURE OF ACTION

1.      Plaintiffs bring this action for declaratory relief, equitable relief and money

damages under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq.

("ERISA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1861 et seq.

("RICO"), and the laws of the State of North Carolina, against a group of Defendants who

knowingly and wrongfully designed and promoted a sham multiple employer welfare benefit plan known as the National Benefit Plan & Trust (the "National Plan"). The Defendants falsely represented to Plaintiffs and other participants that the National Plan was a bona fide employee welfare benefit plan under the federal tax and pension laws that allowed participating employers to deduct their contributions and for employees to receive tax-favored severance benefits.

2. At the time Defendants represented that Plaintiffs could participate in the National Plan on a tax-favored basis, they knew that the IRS had disallowed employer deductions to similar so-called "Section 419" plans and that Plaintiffs, by participating in the National Plan, were being placed at risk of having the IRS disallow their contributions to the National Plan and impose tax penalties. Plaintiffs were in fact audited by the IRS and have become subject to significant adverse tax consequences, including the payment of back taxes, interest and penalties. As outlined below, Defendants also attempted to insulate themselves from liability for their wrongful conduct by attempting to change key aspects of the National Plan to the detriment of Plaintiffs.

3. Plaintiffs bring this action to recover losses that they have suffered as a consequence of the false and misleading misrepresentations that were used by Defendants to induce Plaintiffs to participate in the National Plan and as a consequence of various acts of misconduct of Defendants, outlined in more detail below, after Plaintiffs were already participating in the National Plan.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that claims herein arise under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"), including Sections 404, 405, 409 and 502(a)(2) and (3), 29 U.S.C. §§

1104, 1105, 1109 and 1132(a)(2) and (3), and under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1861 et seq. ("RICO"). The Court has jurisdiction of the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

5. Venue is proper in this District in that a substantial part of the events or omissions giving rise to these claims occurred in this District pursuant to 28 U.S.C. § 1391(a).

## THE PARTIES

6. Plaintiff, The Mineo Corporation ("Mineo"), is a North Carolina Corporation with its principal place of business at P.O. Box 490, 228 U.S. 13 South, Windsor, North Carolina 27983.

7. Plaintiff, The Mineo Corporation Employee Welfare Benefit Plan (the "Mineo Plan"), is in employee benefit plan within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1003(3). Mineo was the sponsor of the Mineo Plan and both Mineo and Francesco Mineo were fiduciaries for the Mineo Plan within the meaning of ERISA.

8. Plaintiff, Francesco Mineo, is a citizen of the State of North Carolina who resides at 1016 Martin's Point Road, Kitty Hawk, NC 27949.

9. Plaintiff, Beverly Mineo, the wife of Francesco Mineo, is a citizen of the State of North Carolina who resides at 1016 Martin's Point Road, Kitty Hawk, NC 27949.

10. Defendant, Philip D. Rowe, is a citizen of the State of California with a residence address at 1139 Granville Drive, Newport Beach, CA 92660.

11. Defendant, Judi Carsrud, is a citizen of the State of California with a residence at 33121 Ocean Ridge, Dana Point, CA 92629.

12.     Defendant, Niche Marketing, Inc. ("Niche Marketing"), is a California corporation with its principal place of business at 3300 Irvin Avenue, Suite 255, Newport Beach, CA 92660.

13.     Rowe and Carsrud formed Niche Marketing in the early 1990's for the purposes of marketing welfare benefit plans to small businesses. Rowe and Carsrud own and control Niche Marketing and formed it for the purposes of promoting the National Plan.

14.     Defendant, Niche Plan Sponsors, Inc. ("Sponsors"), is a California Corporation with its principal place of business at 3300 Irvin Avenue, Suite 255, Newport Beach, CA 92660.

15.     Sponsors is a wholly-subsidiary of Niche Marketing and was formed by Rowe and Carsrud to administer the National Plan. Rowe and Carsrud control the operations of Sponsors.

16.     Defendant, Urah T. Williamson, Jr., is a citizen of the State of North Carolina who resides at 1744 Airport Boulevard, West, Wilson, North Carolina. At all relevant times hereto, Williamson was a principal of the Old Carolina Group, which does business from a location at 2727 Ward Boulevard, Unit A, Wilson, NC 27895.

17.     At all times relevant to this action, Williamson acted as an agent for, and at the direction of, Defendants Rowe, Carsrud, Niche Marketing and Sponsors.

18.     Defendant, Alton G. Mills, is a citizen of the State of North Carolina who resides at 2804 Penfold Lane, Wake Forest, North Carolina. At all relevant times hereto, Mills was a principal of the Old Carolina Group, which does business from a location at 2727 Ward Boulevard, Unit A, Wilson, NC 27895.

19.     At all times relevant to this action, Mills acted as an agent for, and at the direction of, Defendants Rowe, Carsrud, Niche Marketing and Sponsors.

## FACTUAL ALLEGATIONS

20.    Rowe and Carsrud formed the National Plan so that they could sell complex and expensive life insurance products and secretly receive significant amounts of commissions from the sale of those products.  The National Plan was marketed as a multiple employer welfare plan and trust that qualified for favorable tax treatment under Section 419A(f)(6) of the Internal Revenue Code, a provision that allows for the deduction of contributions made by employers to multiple employer welfare benefit plans having ten-or-more employers if certain conditions are met.

21.    Companies participating in the National Plan were told that the plan was structured and operated as follows:

  a.    Employers participating in the National Plan would make annual contributions to the Plan.

  b.    The Trustee for the National Plan, in turn, would purchase life insurance policies that would provide two benefits for the employees of participating employers.

  c.    The first benefit was that all employees of the participating employer would receive life insurance coverage for a multiple of their annual compensation.

  d.    The second benefit was that management employees would receive a lump sum amount upon their retirement or when their employer terminated participation in the National Plan.  This payment was designated as a "severance" payment.

  e.    Both sets of benefits would be funded by having the Trustee purchase life insurance policies for the employees.  In the case of management employees, the Trustee would purchase universal life or whole life policies that would develop cash value.  This cash value would be used to provide the lump-sum severance benefit.  In the case of rank-and-file employees, the Trustee would purchase term life insurance policies that did not develop any cash value.

22.    Employers participating in the National Plan were told that their contributions to the Plan were fully tax-deductible.  As part of their effort to market the National Plan as a way of

deferring income and saving for retirement, Defendants provided prospective participants with comparisons of (a) the value over time of the amounts that they could pay to themselves as bonuses on an after-tax basis to (b) the value of the benefits they could receive if they made tax-deductible contributions to the National Plan. Because of the tax benefits allegedly associated with the National Plan, these comparisons invariably showed that participation the National Plan was a significantly better investment.

23. Individuals knowledgeable about the use of insurance polices in benefit program have known, since well before 2002, that the IRS viewed multiple employer plans that used cash value insurance policies to provide post-employment benefits, including severance benefits and retirement benefits, and that purported to rely on Section 419A(f)(6), as abusive tax avoidance transactions.

24. The IRS first announced its position concerning plans that relied upon Section 419A(f)(6) in Notice 95-34, issued in June of 1995. In that Notice, which addressed "tax problems raised by certain trust arrangements seeking to qualify for exemption from § 419," the IRS cautioned that multiple employer welfare benefit plans that relied upon § 419A(f)(6), and that used insurance polices with cash value to provide retirement or other benefits would be challenged by the IRS and that tax deductions taken by employers participating in such plans would be disallowed by the Service.

25. A true copy of IRS Notice 95-34 is attached as **Exhibit "A"** to this Complaint.

26. After the issuance of Notice 95-34, the IRS disallowed the deductions of a number of participants in plans that claimed to comply with Section 419A(f)(6).

27. In several cases, participants in plans that relied upon Section 419A(f)(6), with the encouragement of the promoters of those plans, challenged the IRS's interpretation of

Section 419(A)(f)(6) in the United States Tax Court. The position taken by the IRS was upheld

by the Tax Court in <u>Booth v. Commissioner of Internal Revenue</u>, 108 T.C. 524, 1997 WL

328581 (1997). <u>Booth</u> held, among other things, that Section 419A(f)(6) did not cover programs

"where multiple employers have contributed funds to an independent party to hold in separate

accounts until disbursed primary for the benefit of the contributing employers' employees in

accordance with unique terms established by that employer."

28.    On February 28, 2000, the IRS issued Notice 2000-15, which announced that

benefit plans with the characteristics identified in Notice 95-34 had been designated by the IRS

as "listed transactions" for the purposes of Section 1.6011-4T(b)(2) of the Temporary Income

Tax Regulations and Section 301.6111-2T(B)(2) of the Temporary Procedure and

Administration Regulations.

29.    A true copy of IRS Notice 2000-15, as issued on February 28, 2000, is attached as

**Exhibit "B"** to this Complaint.

30.    "Listed transactions" are those transactions that the IRS deems be to "abusive" tax

avoidance schemes that presumptively violate the tax laws. Under temporary tax regulations in

effect in 2002, regulations that were later finalized, taxpayers were required to disclose their

participation in listed transactions and promoters or other persons responsible for registering tax

shelter transactions were required to maintain lists of investors and other information relating to

listed transactions and were, under certain circumstances, required to provide that information to

the IRS.

31.    Several months after the issuance of Notice 2000-15, the IRS's position critical of

plans that relied upon Section 419A(f)(6) was again upheld by the United States Tax Court in

<u>Neonatology Associates, P.A. v. Commissioner</u>, 115 T.C. 43 (2000). In <u>Neonatology</u>, the Tax

Court held that employer contributions to Voluntary Employer Benefits Associations, or

"VEBAs," a form of multiple employer plan, that were used to fund retirement benefits were

deferred compensation plans. In disallowing the deductions taken by the participants in the

VEBA, the Tax Court followed almost precisely the reasoning articulated in IRS Notice 95-34

and rejected the promoters' claim that the VEBAs were "ten or more employer plans" entitled to

favorable tax treatment under § 419A(f)(6). The VEBA framework, the Tax Court noted:

> was crafted by the insurance salesmen . . . as a viable tax planning
> device. The VEBA scheme was subscribed to by various small
> businesses whose employees/owners sought primarily the
> advertised tax benefits and tax-free asset accumulation. The
> subject VEBAs were not designed, marketed, purchased or sold as
> a means for an employer to provide welfare benefits to its
> employees.

115 T.C. at 83-84.

32.     In its opinion in Neonatology, the Tax Court also imposed accuracy-related

penalties under Sections 6662(a) & (b)(1) of the Internal Revenue Code for negligence and

intentional disregard of rules and regulations. In imposing accuracy related penalties, the Tax

Court specifically rejected an argument that the tax issues raised were issues of "first

impression" and that the law relating to Section 419 plans was unclear. The Tax Court held, to

the contrary, that the controlling principles of tax law were "well-settled." Id. at 101.

33.     On appeal, the Third Circuit affirmed the Tax Court in all respects. See

Neonatology Associates, P.A. v. Commissioner, 299 F.3d 211 (3d Cir. 2002). With respect to

the Tax Court's findings of fact, the Third Circuit noted that the annual contributions to the

VEBA were so far in excess of the cost of the annual life insurance protection that they "could

not plausibly qualify as ordinary and necessary expenses" under the tax laws. 299 F.3d at 223.

Indeed, the court noted, "we do not see how a court examining this case could conclude

otherwise." Id. at 228.

34.     The Third Circuit also squarely rejected an argument that the case was one of "first impression" and was therefore not appropriate for the imposition of penalties, holding that the applicable principles of tax law were both clear and settled:

> [T]his case does not involve novel questions of law but rather is concerned with the application of well-settled principles of taxation . . ..  While the setting in which these principles have come to bear is no doubt unusual with its VEBAs, C-Group policies, and conversion credits, the law was nevertheless pellucid . . . .

Id. at 234-35.

35.     The decision in Booth and the trial and appellate decisions in Neonatology were well-publicized and were discussed widely within the community of tax attorneys and financial planners who were knowledgeable about employee benefit plans and considered them for their clients.

36.     Rowe and Carsrud had both been involved in the Booth litigation.  As of early 2002, Rowe and Carsrud were also actually aware of Notice 95-34, of Notice 2000-15, and of the Tax Court decision in Neonatology.

37.     Rowe and Carsrud were also actually aware, no later than January of 2002, that numerous tax attorneys and financial planners were cautioning the industry that employee welfare benefit plans that attempted to rely on Section 419A(f)(6) were viewed as unlawful tax avoidance transactions that would be challenged by the IRS.

38.     For example, in 1997, a tax attorney who advised promoters of benefit plans published an article on the Internet in which discussed the Booth decision.  In that article, Bryon R. Prusky noted that benefit plans, in order to comply with Section 419A(f)(6), should avoid providing any severance benefits or other payments that could be characterized as deferred compensation; should be designed as a single plan rather than a grouping of individual plans; and

should not provide for a separate accounting of the benefits to be provided to participating employers or their employees.

39.     A true copy of the Prusky article referred to in the preceding paragraph, as published in 1997, is attached as **Exhibit "C"** to this Complaint.

40.     In an article published in the <u>Journal of Financial Planning</u> in September of 1999, and also made available on the Internet, a financial planner who was consistently critical of Section 419 plans, Peter Katt, accused many promoters of such plans of engaging in fraud and cautioned financial planners to avoid recommending such plans to their clients.  Katt wrote:

> The perfect retirement plan for high income earners has tax-deductible contributions and tax-fee benefits.  Financial product marketers devote great energy and effort to designing retirement plans that feature such claimed tax nirvana, reaping the commission rewards of selling them.  These marketers are greatly aided in their efforts to design and sell such schemes because the tax code is overwhelmingly complicated.  They take the position that if something isn't explicitly prohibited in the tax code, it must be okay.
>
> This results in marketers staying one step ahead of the Internal Revenue Service by creating new versions of old tricks when existing ones have been exposed by the RIS.  Also, consumers of such products, tired of carrying such a heavy income tax burden, are easy prey because of the promised tax benefits.
>
> Unfortunately, in the real world, tax-deductible contributions and tax-fee benefits don't exist without resorting to deception or fraud.  During the past year, I have encountered two variations of the same theme promising consumers these extraordinary tax benefits via the purchase of life insurance.  Both involve a concept known as springing cash values.  This concept features payments of very large premiums while a policy is subject to favorable tax treatments, then transferring the policy to the insured when the policy appears to have no taxable values, after which the cash values spring to life.

41.     A true copy of the Katt article referred to in the preceding paragraph, as published in 1999, is attached as **Exhibit "D"** to this Complaint.

42.     Despite the issuance of IRS Notices 95-34 and 2000-15 and the decisions in Booth and Neonatology, during 2000, 2001, and 2002, a number promoters of Section 419 plans continued to market those plans by claiming, among other things, that their plans had different factual characteristics from those that had been challenged by the IRS and therefore did comply with the law; that the position being taken by the IRS was an incorrect interpretation of the law and could be successfully challenged in the courts; or that the law remained unclear because the IRS had never issued regulations under Section 419.

43.     In order to continue promoting their plans, certain Section 419 sponsors obtained letter-opinions from tax attorneys which purported to opine that contributions to various plans continued to be tax deductible.  These letter opinions were paid for by the promoters of the Section 419 plans and were a key aspect of their marketing efforts.

44.     In fact, these letters, far from representing affirmatively that contributions to the plans were deductible, instead merely opined that there was "substantial authority" for the position that contributions could be deducted.  Such substantial authority opinion letters were designed to enable the promoters to argue that they had acted in good faith and without wrongful intent in marketing their plans and could also be used by participants who were audited to argue that certain tax penalties were not appropriate in the event of an audit.

45.     Rowe, Carsrud, Niche Marketing and Sponsors obtained a series of opinion letters from a "national" law firm.  These opinion letters purported to provide substantial authority for the position that employers could deduct contributions to the National Plan.  Rowe, Carsrud, Niche Marketing and Sponsors actively used the existence of those letters in their efforts to market the National Plan.  As discussed below, after Plaintiffs were audited by the IRS, Rowe,

Carsrud, Niche Marketing and Sponsors also hired the author of this letter to represent Plaintiffs in their IRS audits, despite the obvious conflict of interest such a that representation constituted.

46.     Despite their knowledge of the clear risks associated with continuing to market plans that purported to qualify with Section 419, in or about 2000, Carsrud and Rowe, acting through Niche Marketing and Niche Sponsors, and Niche Marketing and Sponsors, acting through the National Plan, formulated a scheme to market the National Plan with the intent of obscuring and concealing the tax and other risks associated with participation in the National Plan.  As part of this scheme, and in the event that the IRS attacked the National Plan or any participants in it, Defendants intended to falsely claim that the IRS was wrong in its interpretation of Section 419A(f)(6)or was attempting to change the law in an unfair matter, and that they had no idea that any participants were at risk and had at all times acted in good faith.

47.     During the period from 2000 to 2002, the promoters of multiple employer benefit plans that purported to qualify for favorable tax treatment under Section 419 also lobbied Congress and the Administration to enact legislation that would over-rule the IRS's interpretation of Section 419A(f)(6) and would retain for small businesses what those promoters claimed was a valuable vehicle for small businesses to provide benefits to their employees.

48.     Niche was among the plans that contributed to this lobbying effort, which was unsuccessful.

49.     A true and correct copy of a Statement submitted by Carsrud to the Senate Committee on Finance on or about April 18, 2002, is attached as **Exhibit "E"** to this Complaint.

50.     In the Statement attached as Exhibit "E" to this Complaint, Carsrud acknowledged, as a consequence of the IRS's interpretation of Section 419A(f)(6), that "a cloud remains hovering over the 419A(f)(6) marketplace.  Employers are uncertain about whether they

can continue to participate in multiple employer welfare benefit trusts; and trust sponsors, administrators and participants cannot rely on the continued viability of this important employee benefits tool."

51.     Based upon their contentions that their plans complied with Section 419 and their hope that Congress would change to law to over-rule the IRS's interpretation of Section 419, Defendants and other promoters continued to market Section 419A(f)(6) plans aggressively, claiming that contributions to their plans were fully tax-deductible and failing to advise participants of the IRS's position to the contrary and of the significant risks associated with such participation.

52.     Moreover, none of the concerns expressed by Carsrud in their statement to Congress were disclosed by Defendants to Plaintiffs or other participants in the National Plan.

53.     In or about March of 2002, Defendants Williamson and Mills, acting as agents for, and on behalf of Rowe, Carsrud, Niche Marketing and Sponsors, approached Franco Mineo and Beverly Mineo and recommended that Mineo participate in the National Plan as a way to minimize taxes and save for retirement.

54.     During the course of discussions with the Mineos and in written materials provided to the Mineos, Williamson and Mills made the following concerning the National Plan:

> a.    That Mineo Corporation could provide significant amounts of life insurance to its employees and significant monetary severance benefits to Franco and Beverly Mineo;
>
> b.    That the National Plan would act as a retirement plan for Franco and Beverly Mineo;
>
> c.    That the corporate contributions necessary to fund the life insurance and severance benefits of the National Plan were fully tax-deductible;
>
> d.    That the amounts of annual contributions were flexible, so that only minimal contributions needed to be made if an employer experienced cash-flow difficulties;

e.   That after five years of contributions Mineo Corporation could terminate its participation in the National Plan and Franco and Beverly Mineo would receive insurance policies with significant cash value;

f.   That Franco and Beverly Mineo could then derive funds from these individual policies;

g.   That the plan would be administered by an independent trustee and trust administrator; and

h.   That plan administration costs would be minimal, thereby implying that all of the contributions made by Mineo to the National Benefit Plan, except those amounts specifically designated as administrative fees, would be used for the benefit of the employees of Mineo Corporation.

55.   The above representations were made both orally and in documents that were provided to the Mineos during three face-to-face meetings at the offices of Mineo in Windsor, North Carolina, beginning with the meeting in March of 2002 and concluding with a meeting on May 21, 2002.

56.   Mineo, Francesco Mineo and Beverly Mineo relied upon the above-referenced representations in agreeing to participate in the National Plan and, at the meeting on May 21, 2002, executed a series documents provided to them by Defendants, including an "adoption agreement," a corporate resolution adopting the plan and life insurance applications.

57.   The documents provided by Defendants to induce Plaintiffs' participation in the National Plan, and which contained these representations, included the brochure attached as **Exhibit "F"** and the Proposal attached as **Exhibit "G"** to this Complaint.

58.   As a result of the representations made by Williamson and Mills, and as part of their agreement to participate in the National Plan, Plaintiffs agreed to a contribution schedule that provided, among other things, that Mineo would contribute $298,700 per year for the first five years of Plaintiffs' participation in the National Plan.

59.     In return for these contributions to the National Plan, Plaintiffs were told that Francesco Mineo would be covered by a life insurance policy in the amount of approximately $3.5 million, that Beverly Mineo would be covered by a life insurance policy in the approximate amount of $3.3 million and that the third employee of Mineo would be covered by a life insurance policy in the approximate amount of $180,000. In addition, Defendants represented that Franco Mineo and Beverly Mineo would be entitled to severance benefits that would exceed $1.1 million in value at the end of five years and would exceed $1.5 million in value at the end of ten years.

60.     Defendants knew, at the time they persuaded Plaintiffs to participate in the National Plan, that many of their representations were false and misleading. Defendants also concealed material information from Plaintiffs concerning a number of aspects of the National Plan.

61.     More specifically, Defendants knew that the following statements, made by them to induce Plaintiffs to participate in the National Plan, and reasonably relied upon by Plaintiffs, were false:

      a.      That employer contributions to the National Plan were fully deductible under current law;

      b.      That the National Plan qualified for favorable tax treatment under § 419A(f)(6) of the Internal Revenue Code;

      c.      That contributions to the National Plan were not subject to "qualified plan limits";

      d.      That the policies to be purchased by the National Plan would entitle Plaintiffs to significant cash value;

      e.      That those involved in the administration of the National Plan were independent;

      f.      That administrative costs for participation in the National Plan were minimal.

62. During the process of persuading Plaintiffs to participate in the National Plan, Defendants also concealed the following material information from Plaintiffs:

a. That the Internal Revenue Service had successfully challenged plans with similar characteristics to the National Plan that claimed to comply with § 419A(f)(6) of the IRC;

b. That Rowe, Carsrud, Niche Marketing and Sponsors were concerned enough about whether the National Plan was in compliance with the law that they had submitted a statement to the US Senate Committee of Finance in April of 2002, acknowledging that "a cloud…[was] hovering over the 419A(f)(6) marketplace" and acknowledging that the National Plan would have to make "significant modifications" to comply with rules under § 419 that had been proposed by the Internal Revenue Service;

c. That a number of banks and other financial institutions had refused to act as trustees for § 419 plans, for fear of liability exposure;

d. That undisclosed commissions were being paid not only to the local agents who marketed the National Plan but also to Niche Marketing and its principals, so that administrative and marketing costs related to the plan were significant.

63. On July 10, 2002, the Treasury Department issued proposed regulations for benefit plans that relied upon the ten-or-more employer exception set forth in Section 419A(f)(6). These regulations confirmed that the Government intended to adhere to its interpretation of Section 419A(f)(6) and would continue to challenge plans with the characteristics of the National Plan.

64. Rowe, Carsrud and their companies, along with the other promoters of similar plans, objected to these proposed regulations, claiming among other things that the regulations exceeded the authority of the IRS and that they incorporated an incorrect interpretation of the law.

65. After considering various objections to the proposed regulations, on or about July 17, 2003, the Internal Revenue Service issued final regulations relating to Section 419A(f)(6). These final regulations included only minor changes from the proposed regulations and made

clear that plans like the National Plan, which represented that participants could deduct the full

amount of contributions that provided not only current life insurance but which also funded

significant future benefits, would be challenged by the Internal Revenue Service.

66.     Despite the issuance of these final regulations in late 2003, Niche sent a letter to

"All Participating Employers" in the National Plan, including Plaintiffs, advising them that,

"after a thorough analysis of the National Plans, we have concluded that our Plan satisfies the

requirements of these new rules."  This letter further represented that the National Plan was

"careful and conservative" in nature and was not among those plans "struggling with non-

compliance" under the IRS's rules.

67.     A true copy of the letter referred to in the preceding paragraph is attached as

**Exhibit "H"** to this Complaint.

68.     The letter attached as Exhibit H to this Complaint contained statements that were

false and misleading; such statements were made with the intent to mislead participants in the

National Plan into a false sense of security and to induce those participants to continue making

contributions to the National Plan.

69.     During 2004, the IRS continued in its efforts to publicize its view that benefit

plans with the characteristics of the National Plan, and which purported to qualify for favorable

tax treatment under § 419A(f)(6), were deemed "abusive" tax shelters by the IRS.  For example,

in a "headliner" posted on its website on August 5, 2004, the IRS stated the following:

> The Internal Revenue Service is cautioning the public about
> promotions that offer virtually unlimited business deductions for
> employee benefits.  These arrangements purport to offer insurance-
> type programs through a Welfare Benefit Fund for death benefits,
> severance pay, disability pay, long-term care, medical expense
> reimbursement, or other benefits.  Internal Revenue Code §§419
> and 419A establish rules governing deductions for contributions to
> Welfare Benefit Plans.

These arrangements are usually directed to the owner-employees
of small, profitable closely-held business as a way to reduce
corporate earnings that would normally be paid to the owner's
salary.  For most of these arrangements also claim that
participating employees will have to report little or no current
income at the time the corporate payment is made to the fund.  The
common denominator for these promotions is uncharacteristically
high payments that involve an express or implied investment
element held for the benefit of the business owner, who can expect
return of the investment, directly or indirectly, in a later year.

70.    A true copy of the IRS "headliner" referred to in the preceding paragraph is

attached as **Exhibit "I"** to this Complaint.

71.    On or about October 12, 2004, the IRS, in Notice 2004-67, updated its list of

transactions that were determined by it to be tax avoidance "listed transactions."  That list once

again included the transactions identified in Notice 95-34.

72.    In Notice 2004-67, the IRS reiterated that participants in listed transactions were

required to self-report to the IRS their participation in such transactions under Section 1.6011.4

and promoters were reminded of their obligation to register those transactions under Section

301.6111-2.

73.    In a  letter to Plaintiffs dated December, 2004, but not mailed until January, 2005,

Niche Marketing advised Plaintiffs that the National Plan, which had been promoted to Plaintiffs

and others as a multiple employer welfare benefit plan, had been retroactively "split into

individual employer welfare plans as of January 1, 2004."

74.    A true copy of the letter referred to in the preceding paragraph is attached as

**Exhibit "J"** to this Complaint.

75.    The letter attached as Exhibit J attempted to justify Defendants' unilateral change

in the structure of the National Plan by suggesting that Niche had been receiving "increasing

requests from employers to be able to exercise more control over their plan assets than . . .

419A(f)(6) allows."

76.     This letter noted that a law enacted in 2004 authorized the IRS to impose a

$200,000 penalty for entities involved in certain listed transactions and other reportable

transactions.  Although the letter insisted that the National Plan did not have any of the

characteristics that would condemn it as a listed transaction, it cautioned taxpayers that the IRS

had the ability "to accuse a taxpayer of failure to disclose a listed transaction or one substantially

similar and to access the penalty -- and prohibits the taxpayer from any judicial review of the

IRS stance!"  The letter noted that, by splitting the National Plan "into hundreds of individual

employer plans not purporting to qualify for code § 419A(f)(6)," employers would lose some of

the "deductibility benefits" but be protected "from an accusation of the IRS that could result in

unwarranted yet huge penalties."

77.     The statements contained in the letter attached as Exhibit H were false and

misleading and were designed to lull participants in the National Plan into a false sense of

security.  At the time this letter was drafted and circulated to Plaintiffs and other participants in

the National Plan, Rowe and Carsrud knew that the National Plan was unquestionably a "listed"

transaction; they split the National Plan in an attempt to persuade participating employers to

continue contributing to the Plan while minimizing their own exposure.

78.     In late 2004, around the time it determined to split up the National Benefit Plan

into a series of single employer plans, Rowe, Carsrud, Niche Marketing and Niche reported the

National Plan as a "listed" transaction to the IRS and provided the IRS with the names of

employers participating in the National Plan.

79.     As a result of that notification, by letter dated December 13, 2004, the IRS advised the Mineo that the IRS had commenced a tax audit of Mineo for the years 2003 and 2004.  The IRS subsequently commenced tax audits for Franco and Beverly Mineo individually.

80.     As a result of Niche's identification to the IRS of other participants in the National Plan, a number of those other participants were also audited by the IRS.

81.     In an effort to insulate itself from liability for having knowingly marketed the National Plan through false and misleading statements, including false and misleading statements about the deductibility of contributions to that Plan in early 2005, Rowe, Carsrud, Niche Marketing and Sponsors, purportedly acting for the benefit of plan participants, created a new Trust Agreement for the National Plan. That Trust Agreement included an arbitration provision -- Section 15.08 -- which provided, among other things, that any dispute or controversy arising under the National Plan would be resolved through binding arbitration in Orange County, California before a single arbitrator; that the arbitration would occur within thirty (30) days of receipt by the American Arbitration Association of a Demand for Arbitration; and that each party to the arbitration would bear its own attorneys' fees and costs of arbitration.

82.     A true copy of the arbitration provision included by Rowe, Carsrud, Niche Marketing and Sponsors in the 2005 Trust Agreement for the National Plan is attached as **Exhibit "K"** to this Complaint.

83.     No dispute resolution or arbitration provision had been included in the National Plan documents the existed at the time Plaintiffs agreed to participate in the National Plan.  The inclusion of § 15.08 in new plan documents prepared in 2005 was designed solely for the benefit of Defendants in an attempt to insulate them from claims by plan participants.  This dispute resolution provision attempted to do this by:

a.      requiring non-public arbitration;

b.      requiring arbitration proceedings to take place in Orange County, California, a distant and highly inconvenient form for Plaintiffs and other participants in the National Plan;

c.      effectively eliminating the ability of any participant to obtain discovery by requiring the arbitration to occur within thirty (30) days after the filing an arbitration demand; and

d.      eliminating the ability of any claimant to recover attorneys' fees under any fee-shifting statute by specifying that each party would bear its own attorneys' fees and costs of arbitration.

84.      The new Trust Agreement created by Defendants was not reviewed, approved or accepted by Plaintiffs or other participants in the National Plan, was not supported by any consideration, and was designed solely to benefit Defendants at the expense of participants in the National Plan.

85.      After Mineo received notice that it was being audited by the IRS and was advised by the IRS that its audit related to its participation in the National Plan, Plaintiffs contacted Williamson, Mills, Rowe and Carsrud, both to request their assistance in reporting to the audit and to question whether Defendants were aware of any problems with the National Plan.

86.      During oral and written communications beginning in January of 2005, these Defendants assured Plaintiffs that the National Plan was entirely proper, told them that the IRS was wrong in its position but was trying to raise money for the Iraq war and would back off if its position was challenged, and assured the Plaintiffs that the National Plan would operate as initially represented.

87.      Claiming that they desired to assist Plaintiffs in successfully resolving the IRS audit, these Defendants also recommended that Plaintiffs engage the attorney who had provided opinion letters that purported to opine that there was "substantial authority" to believe that the

National Plan complied with the tax laws. Plaintiffs agreed to engage that attorney after he assured them, in writing, that he had no conflict of interest in assisting them.

88.     Throughout the course of Plaintiffs' audits by the IRS, audits that remain on-going, Defendants and those acting in concert with them repeatedly assured Plaintiffs that the National Plan, both as originally structured after it was split into individual plans, complied with the tax laws such that contributions could be deducted.

89.     Plaintiffs did not become aware that the attorney recommended by Defendants was acting primarily to protect the interests of Defendants, rather than their interests, until after Francesco Mineo attended a hearing before an IRS hearing officer on or about June 20, 2007.

90.     The conduct of Defendants in "splitting" the National Plan into individual employer plans and falsely advising Plaintiffs that the IRS might deem the National Plan not eligible for tax-deductible contributions placed Plaintiffs and other participants in the National Plan in an awkward position. Plaintiffs had agreed to participate in the National Plan based upon representations that contributions were lawfully tax-deductible. If contributions were not deductible, the economics of the Plan did not work for Plaintiffs and they could not have afforded to participate. At the same time, it became unclear whether, if Plaintiffs withdrew from the Plan, they were entitled to the cash value of the policies purchased by the National Plan and, if so, the value of those policies.

91.     Faced with this dilemma, and based upon the reassurances provided by Defendants, Plaintiffs continued to contribute to the National Plan through December of 2006.

92.     Defendants Williamson, Rowe and Carsrud have consistently represented to Plaintiffs that Mineo could withdraw from the National Plan and that the whole life insurance policies issued to cover Franco Mineo and Beverly Mineo, policies that have significant cash

value, could be transferred by the National Plan to Franco Mineo and Beverly Mineo individually. Despite these assurances, and despite numerous requests to transfer those policies beginning in or about April of 2007, to date the life insurance carrier who issued those policies has yet to transfer the policies.

93.    Representatives of the insurance carrier, working with Defendants, have repeatedly advised Plaintiffs that they would attempt to effect a transfer of the policies to the Mineos individually and have never indicated that such a transfer would not be permitted.

94.    Upon information and belief, Defendants and the insurance carrier have no intention of transferring the policies and have attempted to lull Plaintiffs into inaction so that Defendants could later argue that the statute of limitations had run on certain of Plaintiffs claims.

95.    In total, during the period from 2002 from 2006, Plaintiffs contributed almost $1.5 million to the National Benefit Plan. The dates and amounts of those contributions are as follows:

| Year | Date of Check | Amount |
|---|---|---|
| | | |
| 2002 | 5/21/02 | $200,000 |
| | 5/21/02 | $      750 |
| | 8/31/02 | $100,000 |
| 2003 | 12/11/03 | $301,500 |
| 204 | 12/15/04 | $298,315 |
| 2005 | 12/29/05 | $296,933 |
| 2006 | 12/16/06 | $290,740 |
| **Total** | | **$1,488,238** |

96.    In addition, Plaintiffs also paid administrative fees relating to the National Plan.

97.    Plaintiffs have suffered damages in that, by virtue of the failure of Defendants to arrange for the transfer of the policies, Plaintiffs are faced with the possibility of forfeiting the value of the annuities they contributed to the National Plan.

98.     Plaintiffs have also been harmed in that they have been forced to incur legal and accounting fees to understand that National Plan and defend themselves in during protracted IRS audit proceedings.

## COUNT I

**(Fraud -- Plaintiffs v. Williamson, Mills, Rowe, Carsrud, Niche Marketing and Sponsors)**

99.     Plaintiffs incorporate the allegations of Paragraphs 1 through and including 98 as if fully sets forth herein.

100.     As set forth above, during the period leading up to May 21, 2002, Williamson and Mills made numerous misrepresentations of material fact and omitted to disclose material information.

101.     During the course of making those misrepresentations, both orally and in writing, Williamson and Mills were acting as agents for, and in concert with, Rowe, Carsrud, Niche Marketing and Sponsors.

102.     The misrepresentations made by these Defendants during the period leading up to May 21, 2002, were false, were known by said Defendants to be false when made, and were made with the intent and expectation that Plaintiffs would rely upon them and agree to participate in and contribute to the National Benefit Plan.

103.     As also alleged above, after Plaintiffs were participating in the National Plan, these Defendants repeated these same misrepresentations and also made additional misrepresentations concerning the IRS's position, the likely outcome of the IRS audit and Defendants' intentions to arrange for the issuance of insurance policies to Franco and Beverly Mineo.

104.     Plaintiffs reasonably relied upon the misrepresentations of Defendants

Williamson, Mills, Rowe, Carsrud, Niche Marketing and Sponsors in agreeing to participate in

the National Plan and making payments to the National Plan during the period from 2002 to

2006.

105.     Plaintiffs have suffered damages and other harm and will suffer additional

damages and other harm as result of the fraudulent conduct of said Defendants.

106.     At all times relevant hereto, said Defendants acted willfully, outrageously,

maliciously and with specific intent to defraud and harm Plaintiffs and to benefit themselves,

such that a significant award of punitive damages is appropriate.


## COUNT II

**(Negligent Misrepresentation -- Plaintiffs v**.  **Williamson, Mills, Rowe, Carsrud, Niche Marketing and Sponsors)**

107.     Plaintiffs incorporate the allegations of Paragraphs 1 through and including 106 as

if fully set forth herein.

108.     To the extent Defendants Williamson, Mills, Rowe, Carsrud, Niche Marketing

and Sponsors, did not act with wrongful intent, they are liable for negligent misrepresentation.

## COUNT III

**(Violation of the North Carolina Consumer Protection Statute -- Plaintiffs v. Williamson, Mills, Rowe, Carsrud, Niche Marketing and Sponsors)**

109.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 108 as if fully sets forth herein.

110.    Through the misconduct alleged in this Complaint, defendants violated N.C.G.S.A. § 75-1.1 by engaging in unfair and deceptive acts and practices.

111.    Said unfair and deceptive acts and practices affected commerce.

112.    Defendants' use of unfair and deceptive acts and practices proximately caused actual injury to plaintiffs and their business.

## COUNT IV

**(Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") -- Plaintiffs v. Rowe and Carsrud [Niche Marketing and Sponsors as RICO Enterprises])**

113.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 112 as if fully set forth herein.

114.    Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1961(3).

115.    Rowe and Carsrud are "persons" within the meaning of 18 U.S.C. § 1961(3).

116.    Niche Marketing and Sponsors are each an "enterprise" engaged in, and the activities of which affect, interstate or foreign commerce, within the meaning of 18 U.S.C. § 1961(4).

117.    Rowe and Carsrud participated in the conduct of the affairs of each of Niche Marketing and Sponsors through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), and thereby violated 18 U.S.C. § 1962(c).

118.     The pattern of racketeering activity engaged in Rowe and Carsrud consisted of numerous violations of 18 U.S.C. §§ 664, 1341 and 1343, in that said Defendants embezzled, stole, or unlawfully and willfully converted to their use assets of employee welfare benefit plans, in violation of 18 U.S.C. § 664, and formulated a scheme or artifice to defraud Plaintiffs and others and used the U.S. mails and the interstate wires in furtherance of that scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

119.     Section 664 of Title 18, provides as follows:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any monies, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or any fund connected therewith, shall be fined under this Title, or imprisoned not more than five years, or both.

18 U.S.C. § 664.  This provision further defines the term "any employee welfare benefit plan or employee pension benefit plan" to mean any employee benefit plan subject to any provision of Title 1 of ERISA.

120.     The Mineo Plan qualified as an a employee welfare benefit plan within the meaning of 18 U.S.C. § 664.

121.     The contributions made by  Mineo to the National Plan constituted "monies, property, or other assets" of an employee welfare benefit plan within the meaning of Section 664.

122.     The elements of the predicate acts of mail and wire fraud are (1) the existence of a scheme or artifice to defraud; (2) the participation by the defendant in the scheme with specific intent to defraud; and (3) the use of the United States mails or of interstate wire communications in furtherance of the fraudulent scheme.

123. As described above, Rowe and Carsrud formulated and participated in a scheme to defraud Plaintiffs and other participants in the National Plan by selling overpriced insurance through misrepresentations and without advising Plaintiffs and other participants of the risks associated with participation in the National Plan and with the intent of misleading those participants in the event the IRS attacked the plan or disallowed deductions.

124. Working through Niche Marketing and Sponsors and relating entities, including 419 Administrators, Rowe and Carsrud (a) prepared promotional materials that contained the affirmative misrepresentations noted above and that omitted to disclose the material information noted above; (b) trained agents, including Williamson and Mills, to market the National Plan through misrepresentations and the concealment of material information; (c) marketed the National Plan; (d) falsely assured Plaintiffs and others after they had already committed to participating in the National Plan that they should continue participating even after the IRS step up enforcement activities; (e) mislead Plaintiffs and others who were being audited by the IRS by arranging for Niche's agents and attorneys to defend the audits; and (f) distributed the profits of their scheme by paying and receiving undisclosed commissions based upon contributions made by Plaintiffs and others to the National Plan.

125. In order to further the scheme referred to above, Rowe and Carsrud used or caused others to use the United States mails and interstate wire transmissions (both faxes and emails).

126. The uses of the mails and interstate wires in furtherance of the scheme to defraud included the following categories of communications:

      a.     correspondence and other materials that represented the benefits of the National Plan and how it would operate;

      b.     projections of benefits provided to Plaintiffs and other participants in the National Plan;

c.      letters sent by representatives of Niche Marketing and Sponsors and their agents to Plaintiffs and other participants in the National Plan;

d.      billing statements mailed by Niche Marketing and Sponsors to Plaintiffs and other participants in the National Plan

e.      checks forwarded by Plaintiffs and other participants in the National Plan to Niche;

f.      checks forwarded by Niche Marketing and Sponsors to the Trustees of the National Plan;

g.      funds mailed or wired by the Trustees of the National Plan to Niche Marketing and Sponsors;

h.      commission checks mailed or wired by Niche Marketing, Sponsors, Rowe and Carsrud to agents such as Williamson and Mills whereby they divided up the profits of their scheme;

i.      fax transmissions, letters and emails sent between representatives Rowe, Carsrud and others engaged by them whereby these parties worked together to conceal the tax and other risks associated with the National Benefit Plan.

127.    Each such communication constituted a separate violation of the mail or wire fraud statutes.

128.    Rowe and Carsrud used caused the mails and wires to be used in similar fashion and thereby committed numerous other mail and wire fraud violations in their dealings with other participants in the National Plan.

129.    Upon information and belief, Rowe and Carsrud fraudulently induced more than fifty other same businesses and their principals to participate in the National Plan through the fraudulent scheme alleged herein, and caused the United States mails and interstate wires to be used in misleading and defrauding those other participants in the National Plan.

130.    The pattern of racketeering activity engaged in by Rowe and Carsrud began in or about 2000 and has continued to date and is part of said Defendants' way of doing business.

131.     Plaintiffs have suffered injury to their business or property within the meaning of 18 U.S.C. § 1964(c) as a consequence of the violation by Rowe and Carsrud of 18 U.S.C. § 1962(c).

132.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages, attorneys' fees and related expenses and appropriate equitable relief.


## COUNT V

**(Violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO")
Plaintiffs v. Niche Marketing, Sponsors and 419 Administrators--
[The National Plan as RICO Enterprise])**

133.     Plaintiffs incorporate the allegations of Paragraphs 1 through and including 132 as if fully set forth herein.

134.     Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1961(3).

135.     Niche Marketing, Sponsors and 419 Administrators are "persons" within the meaning of 18 U.S.C. § 1961(3).

136.     The National Plan is an "enterprise" engaged in, and the activities of which affected, interstate or foreign commerce, within the meaning of 18 U.S.C. § 1961(4).

137.     Niche Marketing, Sponsors and 419 Administrators participated in the conduct of the affairs of the National Plan through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), and thereby violated 18 U.S.C. § 1962(c).

138.     The pattern of racketeering activity engaged in by the Defendants named in this Count consisted of numerous violations of 18 U.S.C. §§ 664, 1341 and 1343, in that said Defendants embezzled, stole, or unlawfully and willfully converted to their use assets of employee welfare benefit plans, in violation of 18 U.S.C. § 664, and formulated a scheme or artifice to defraud Plaintiffs and others and used the U.S. mails and the interstate wires in

furtherance of that scheme, in violation of 18 U.S.C. §§ 1341 and 1343, all as set forth more fully in Court III of this Complaint and Exhibit J hereto.

139.    Niche Marketing and Sponsors used caused the mails and wires to be used in similar fashion and thereby committed numerous other mail and wire fraud violations in their dealings with other participants in the National Plan.

140.    Upon information and belief, Niche Marketing and Sponsors fraudulently induced more than fifty other same businesses and their principals to participate in the National Plan through the fraudulent scheme alleged herein, and caused the use of the United States mails and interstate wires in connection with misleading and defrauding those other participants in the National Plan.

141.    The pattern of racketeering activity engaged in by Niche Marketing and Sponsors began in or about 2000 and has continued to date and is part of said Defendants' way of doing business.

142.    Plaintiffs have suffered injury to their business or property within the meaning of 18 U.S.C. § 1964(c) as a consequence of the violation by Niche Marketing and Sponsors of 18 U.S.C. § 1962(c).

143.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages, attorneys' fees and related expenses and appropriate equitable relief.

## COUNT VI - VIOLATIONS OF ERISA

### (Plaintiffs v. Rowe, Carsrud, Niche Marketing and Sponsors)

144.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 143 as it fully sets forth herein.

145.     By virtue of its decision to participate in the National Plan, Mineo, as sponsor, created a single-employer benefit plan in that was governed by ERISA.  That benefit plan was later formally designated as the Mineo Plan.

146.     The National Plan, a purported multiple employer plan, was never a plan governed by ERISA.

147.     Mineo, as the sponsor of and as an administrator and fiduciary for the Mineo Plan, has standing to assert claims under § 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1132(a)(2) and (3).  Plaintiffs Francesco Mineo and Beverly Mineo, as employees of the Mineo, and participants in and beneficiaries of the Mineo Plan, also have standing to assert claims under the same provisions.

148.     By virtue of their access to and control over the assets of the Mineo Plan and their discretionary authority in the administration of the Mineo Plan, Rowe, Carsrud, Niche Marketing and Sponsors were fiduciaries within the meaning of Section 3(21) of ERISA, 29 U.S.C. § 1002(3) with respect to the Mineo Plan during the period after the Mineo Plan was participating in the National Plan.

149.     Said defendants were not ERISA fiduciaries during the period before the Mineo Plan was participating in the National Plan.

150.     During the period in which Rowe, Carsrud, Niche Marketing and Sponsors were fiduciaries of and/or administrators for the Mineo Plan, they engaged in numerous prohibited transactions in violation of Section 510 of ERISA by, among other things, arranging for the insurance companies from whom insurance was purchased to pay undisclosed commissions to them and their agents.

151.     The fact of the commission payments referred to in the proceeding paragraph was never disclosed to or approved by any of the Plaintiffs and was inconsistent with the fiduciary responsibilities of said Defendants.

152.     During the period in which Rowe, Carsrud, Niche Marketing and Sponsors were fiduciaries with respect to the Mineo Plan, they also breached their fiduciary duties under ERISA and violated obligations to Plaintiffs by, among other things,

a.       making affirmative misrepresentations to Plaintiffs, including the misrepresentations outlined in this Complaint;

b.       concealing material information, including the secret and lawful compensation arrangements referred to above;

c.       mishandling, misappropriating and misapplying assets of the Mineo Plan;

d.       providing services to the Mineo Plan for which they received excessive and unreasonable compensation;

e.       not acting solely in the interest of the Mineo Plan and its participants by, among other things, not acting for the exclusive purpose of providing benefits under the Mineo Plan and defraying the reasonable expenses of administering the Mineo Plan; by not acting with the care, skill, prudence and diligence under the circumstances prevailing that a prudent person acting in a light capacity and familiar with these matters would use in the conduct of an enterprise of like character and with like aim; and in accordance with the documents and instruments governing the Mineo Plan;

f.       failing to disclose and concealing documents and other information that would have revealed to Plaintiffs that Defendants had engaged in serious misconduct.

153.     As a consequence of said misconduct, Defendants Rowe, Carsrud, Niche Marketing and Niche are liable to Plaintiffs under Sections 409 and 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1109 and 1132(a)(2) and (3).

## COUNT VII

### (For Declaratory and Injunctive Relief -- Violation of Section 410 of ERISA)

154. Plaintiffs incorporate the allegations of Paragraphs 1 through and including 153 as if fully set forth herein.

155. Section 410 of ERISA, relating to exculpatory provisions and insurance, provides, among other things, that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any reasonability, obligation, or duty under this part shall be void as against public policy."

156. The arbitration provision unilaterally included by Niche Marketing and Niche Sponsors in the 2005 Trust Agreement, a copy of which is attached as **Exhibit "K"** to this Complaint, is an exculpatory provision that violates Section 410 of ERISA. Said arbitration provision serves no legitimate purpose, is contrary to the best interests of Plaintiffs and other participants in the National Benefit Plan, and was intended primarily to protect Niche Marketing and Sponsors from responsibility or liability for their misconduct in marketing and administering the National Benefit Plan.

157. By attempting to make it enormously inconvenient and expensive for participants to proceed to arbitration, and by attempting to deprive any participants who might proceed to arbitration of meaningful discovery or due process, that arbitration provision, if enforced, would effectively relieve Niche Marketing and Sponsors from liability for violations of Section 410 of ERISA.

158. Plaintiffs are entitled to a declaration that the arbitration provision contained in the revised Trust Agreement is void and unenforceable and an injunction against any attempt to enforce said provision.

159.    Plaintiffs will suffer irreparable harm and a deprivation of their rights of due process in the event the arbitration provision is enforced against them.


## COUNT VIII

### (For Declaratory and Injunctive Relief -- Under the Law of North Carolina)

160.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 159 as it fully sets forth herein.

161.    To the extent that the relationship between Plaintiffs and Defendants is not governed by ERISA, the arbitration provision unilaterally included by Niche Marketing and Sponsors in the 2005 Trust Agreement, a copy of which is attached as Exhibit "K" to this Complaint, is unenforceable under the law of North Carolina.  Said provision was never agreed to by Plaintiffs, was not supported by any consideration and is both procedurally and substantively unconscionable.

162.    Plaintiffs are entitled to a declaration that the arbitration provision contained in the revised Trust Agreement is void and unenforceable and an injunction against the enforcement of said provision.

163.    Plaintiffs will suffer irreparable harm and a deprivation of their rights of due process in the event that the arbitration provision is enforced against them.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for some or all of the following relief:

a.      declaratory relief, including a declaratory judgment voiding the arbitration provision noted above;

b.      treble damages, attorneys' fees, experts fees and costs of investigation under federal RICO;

c.      treble damages, attorneys' fees, experts fees and costs of investigation under federal RICO;

d.      all appropriate relief under ERISA, including but not limited to an accounting, disgorgement, rescission or other appropriate equitable relief, interest and attorneys' fees;

e.      an accounting with respect to the disposition of all amounts paid by Plaintiffs to the National Plan and all compensation received by Defendants;

f.      rescission under state law;

g.      disgorgement under state law;

h.      compensatory damages;

i.      punitive damages;

j.      interest, costs of suit, and such other and further relief as the Court may deem just, equitable or proper.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all claims so triable.

/s/ Steven J. Fram
STEVEN J. FRAM
Attorney for Plaintiffs
ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ  08033
Phone:  856-354-3051
Fax:  856-795-0574

/s/ J. Bryan Plumlee
J. BRYAN PLUMLEE
Attorney for Plaintiffs
HUFF, POOLE AND MAHONEY, P.C.
4705 Columbus Street
Virginia Beach, VA 23462
Phone:  757-499-1841
Fax:  757-552-6016
North Carolina Bar No. 23447
LR 83.1 Counsel

Dated:  December 13, 2007.

3001742v1